UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                                    No. 20-cr-20380

v.                                                  Honorable Nancy G. Edmunds

D-2 BRIAN W. BENDEROFF
       Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT BENDEROFF'S MOTION TO DISMISS THE INDICTMENT [124]**

This matter is before the Court on Defendant Brian W. Benderoff's motion to dismiss the indictment as time-barred and for failure to charge a crime. (ECF No. 124.) The government filed a response with sealed exhibits and Defendant filed a reply. (ECF Nos. 134, 135, 143, 144.) The Court finds that the matter is fully briefed and oral argument is not necessary on this matter. (LR 7.1(f)(2).) For the reasons set forth below, Defendant's motion is granted.[1]

**I.    Background**

On June 23, 2016, Defendant Benderoff (hereinafter Defendant) and co-defendant William Gonte were allegedly detained by federal agents at the airport in Detroit. Defendant describes the event as involving "10 hours of detainment and interrogation." (ECF No. 36 at 6 of 20.) The government characterizes the events of June 23, 2016,

---

[1] Co-Defendant William Gonte filed a notice of joinder/concurrence in Defendant Benderoff's motion to dismiss. (ECF No. 125.) The findings herein also apply to Defendant Gonte.

1

differently, noting only that "[o]n June 23, 2016—months before he executed his proffer agreement with the government—Benderoff voluntarily submitted to an interview with federal law enforcement agents." (Gov't's Resp., ECF No. 44 *sealed*, PageID.271.) The parties disagree about the character of that meeting; Defendant alleges that the event was less a voluntary interview than an unlawful detention.[2] The government asserts that during that interview, Defendant "provided extensive detail about various crimes in which he has engaged, including the life insurance fraud scheme charged in this indictment." (*Id.*, PageID.271-72.)

The indictment was filed in this case on August 26, 2020. (ECF No. 1.) Defendants were indicted on seven counts: Count 1, conspiracy to commit wire fraud affecting a financial institution, 18 U.S.C. § 1349; and Counts 2 through 7, wire fraud affecting a financial institution and aiding and abetting, 18 U.S.C. §§ 1343 and 2. (Indictment, ECF No. 1.) The government argues that each of these charges is timely because each offense was completed on or after August 25, 2010. (Response, ECF No. 134, PageID.2382.)

The alleged fraudulent scheme involved the sale of life insurance policies in a life settlement transaction. The following allegations are set forth in the indictment. "In a life settlement transaction, the purchaser typically makes a lump-sum payment to the seller of the policy. In exchange, the purchaser, who assumes responsibility for future premium payments, becomes the beneficiary of the policy's death benefit." (Indictment ¶ 5, ECF No. 1.) The value of the policy is based heavily on the insured's life expectancy. As part

---

[2] Defendant's pending motion to suppress evidence is made moot by the conclusions herein. (ECF No. 110.) Each party has submitted evidence in support of its position and the upcoming hearing on the matter is cancelled.

of marketing the life settlement transaction, the seller or a broker commonly obtain life expectancy reports (LERs). (Indictment ¶ 7.) Policies where the insured has a shorter life expectancy typically sell for higher prices. (Indictment ¶ 6.)

An individual identified as "Owner A" owned six life insurance policies on which his mother was the insured, totaling death benefits of $63 million. (Indictment ¶ 18.) Owner A made late and insufficient premium payments on certain policies and risked the policies lapsing. (*Id.* ¶ 21.) In or around 2008, Owner A attempted to sell certain policies. Credit Suisse declined to bid on them, citing in response to one of the policies that "it still won't work b/c of the long LE's [life expectancies]. . . ." (*Id.* at ¶ 23.)

In 2009, Owner A entered into a proceeds-sharing agreement dated February 1, 2009, with Defendant Gonte for the proceeds of the sale of the life insurance policies. (*Id.* ¶ 26.) On or about February 9, 2009, Owner A entered into an agreement with Broker A's life settlement brokerage firm to be the broker of record for four of the policies. Defendant Benderoff is affiliated with Broker A. (*Id*. ¶ 28.) It is alleged that Defendant Gonte caused false medical records regarding Owner A's mother to be generated to make her appear in worse health than she actually was, including false blood tests and laboratory reports. (*Id.* ¶ 30.) These false records were then submitted to life expectancy providers, who, believing the records to be legitimate, created life expectancy reports for Owner A's mother that contained artificially low life expectancy projections. (*Id.* ¶ 32.) These LERs were submitted to Credit Suisse in approximately May 2010.

In or about July 2010, Credit Suisse offered to purchase Lincoln Benefit Life Policy #3495 for $2.1 million. (*Id.* ¶ 34.) In August 2010, Owner A signed a life insurance settlement application, which was submitted to Credit Suisse for the sale of Policy #3495.

(*Id.* at 35.) On or about September 8, 2010, Wells Fargo Bank, N.A. made an interstate wire transfer of approximately $1.9 million to Owner A for the purchase of Policy #3495. (*Id.* ¶ 39.) On September 20, Wells Fargo made a wire transfer of approximately $200,000 to Broker A for the purchase of Policy #3495. (*Id.* ¶ 40.) On approximately September 7, 2010, Lincoln Benefit Life Policy #3691 was sold for approximately $1.61 million. $1.13 million was wired to Owner A and approximately $480,000 was provided to Broker A.[3] (*Id.* ¶ 42.)

In connection with the sale of Policy #3691, around August 18, 2010, Defendants Benderoff and Gonte caused themselves to be identified as designated contacts of Owner A's mother, for the purpose of providing future information regarding Owner A's mother's health, whereabouts, medical condition and attending physician. (*Id.* ¶ 46.) Defendant Benderoff was listed as a "friend" in this designation. (*Id.*) On or about the same date, Defendants were also identified as alternate contacts of Owner A's mother in connection with the sale of Policy #3495, for the purpose of providing future information regarding her "medical status and place of residence." (*Id.*) Again, Defendant Benderoff was identified as her "friend." (*Id.*) Defendant Benderoff provided updates regarding Owner A's mother's purported medical status (reporting it as "stable") on the following dates: March 24, 2016; September 22, 2016; and March 22, 2017. (*Id.* ¶ 48.) The indictment alleges that these ongoing updates about the mother's purported medical status were "aimed to lull victims into a false sense of security regarding their purchase of the Policies and make it less likely that the fraudulent scheme would be discovered." (*Id.* ¶ 49.) The

---

[3] The indictment does not indicate that Wells Fargo or Credit Suisse were involved in the sale of Policy #3691. (Indictment ¶ 42.)

indictment does not indicate for which of the Policies the status "updates" were made. The updates were between Defendant and a company not identified as Credit Suisse or Wells Fargo.  (*Id.* ¶ 68.)

After the policies were sold, Owner A paid co-defendant Gonte "approximately $1.5 million." (*Id.* ¶ 52.)  Defendant Benderoff received several hundred dollars from Broker A for his role in facilitating the sale of the policies.  (*Id.* ¶ 53.) Although Credit Suisse and other entities purchased the policies, the indictment alleges that the scheme to defraud affected Wells Fargo, which "took ownership" of certain policies and became the beneficiary of them.  (*Id.* ¶ 58.)

Defendant brings this motion challenging the application of a 10-year statute of limitations for fraud "affecting" a financial institution.  18 U.S.C. § 3293.  Defendant argues that Wells Fargo acted as an escrow agent or intermediary and was "free from virtually any risks involved in the transaction," and therefore was not "affected" by the fraud. (ECF No. 124, PageID.2205.) Therefore, argues Defendant, the charges are subject to a five-year statute of limitations, which has passed.

## II.     Analysis

### A.  Legal Standard

Defendant brings this motion pursuant to Fed. R. Crim. P. 12(b) to dismiss the indictment, alleging that counts one through four are time-barred and counts five through seven fail to charge a cognizable crime.  (ECF No. 124.)

Federal Rule of Criminal Procedure 12(b)(1) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1); *see also* Fed. R. Crim. P. 12(b)(3) ("The

following . . . must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits . . . .").

> Generally, motions are capable of determination before trial if they raise questions of law rather than fact. However, ... a district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motion so long as the court's findings on the motion do not invade the province of the ultimate finder of fact. Thus, a defense is "'capable of determination' if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense."

*United States v. Jones*, 542 F.2d 661, 664-65 (6th Cir.1976) (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)) (internal citations omitted). On a motion to dismiss, the Court must view the indictment's factual allegations as true, and must determine only whether the indictment is "valid on its face." *Costello v. United States*, 350 U.S. 359, 363 (1956).

## B. Statute of Limitations

### 1. Whether The Indictment Charges Wire Fraud Affecting A Financial Institution

As an initial matter, the Court addresses the government's argument that Defendant's "arguments depend on a factual premise that contradicts the indictment and is therefore for the jury to determine, not the Court." (ECF NO. 134, PageID.2379.) "The statute of limitations is an affirmative defense that may be waived under Federal Rule of Criminal Procedure 12(f) if not raised at or before trial." *United States v. Craft*, 105 F.3d 1123, 1127 (6th Cir. 1997) (citations omitted). The Sixth Circuit acknowledges that

> [T]he statute of limitations question is one that should be separated from the merits of the underlying conspiracy charge. Here, the facts relating to the disposition of the statute of limitations issue are stated in the indictment or constitute preliminary facts easily isolated from the issues on the merits. These facts are essentially undisputed and raise a legal issue, not a factual one.

*Id.*

Count 1 of the indictment is brought under 18 U.S.C. § 1349, Conspiracy to Commit Wire Fraud Affecting a Financial Institution. (ECF No. 1.) Counts two through seven are brought under 18 U.S.C. §§ 1343 and 2, Wire Fraud Affecting a Financial Institution and Aiding and Abetting. The counts allege an effect on the financial institution Wells Fargo Bank, N.A. (ECF No. 1.)

Defendant argues that the general five-year statute of limitations should apply to counts 1 through 4. 18 U.S.C. § 3282(a) provides

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

The government applied section 3293, which extends the statute of limitations for wire fraud under section 1341 or 1343 to ten years "if the offense affects a financial institution." 18 U.S.C. § 3293. The statute of limitations runs from the commission of the offense until an indictment is returned or a criminal information is filed. 18 U.S.C. § 3293; *see also United States v. Gahan*, 2018 WL 5603535, at *10 (W.D. Mich. Oct. 30, 2018). The grand jury returned the indictment on August 26, 2020. (ECF No. 1.) The government alleges that each charge in the indictment is timely because each was completed on or after August 26, 2010. (ECF No. 134, PageID.2382.)

According to Defendant, the question before the Court is whether the alleged fraud "affected" Wells Fargo, as set forth in the indictment. (ECF No. 124.) As the First Circuit noted, "[n]o definition of 'affect' is found in the statute." *United States v. Agne*, 214 F.3d 47, 51 (1st Cir. 2000). In considering two other cases in which circuit courts interpreted section 3293(2), the *Agne* court noted that in both of those cases "the financial institution

7

presumably suffered a loss or at the very least was exposed to a high risk of loss as a result of defendant's commission of fraud resulting in a loss to its subordinate entity." *Id.* at 51-52.

In *Agne*, the defendant fraudulently drew on a letter of credit that had been issued by a bank. *Id.* at 50. Both the terms of the letter of credit and its application protected the bank, even in the event of a potential civil suit had it wrongfully honored the letter of credit. *Id.* at 52. The court concluded that the "consequence to the bank, if any, is too remote to sustain the conviction." *Id.* The First Circuit noted that its conclusion in that case "does not mean that a bank could never be 'affected' by the use of fraudulent documents to draw the funds of another," but the court could not conclude "that defendant's actions 'affected' a financial institution within the plain meaning of that term because the bank suffered no actual financial loss and experienced no realistic prospect of loss because of the continuing adequacy of funds in R.G.'s corporate account and the protective terms of the letter of credit." *Id.* at 53. The court reversed the defendant's conviction for wire fraud as time-barred. *Id.* at 57.

The Western District of Michigan distinguished *Agne* in *United States v. Gahan*. There the defendant conspired with another in "failing to disclose existing liens on properties in title commitments, failing to pay off liens after the closing, and/or failing to record new liens." *See Gahan*, 2018 WL 5603535, at *1. Defendant also secured new mortgages on his own residences without disclosing existing mortgage liens and pocketed the proceeds without paying off underlying mortgages. Lien holders discovered their mortgage liens had not been paid off and homeowners faced foreclosure proceedings from financial institutions of which the homeowners had been unaware. *Id.*

8

at *2. In his plea, the defendant admitted that the victim lenders and insurers had suffered losses between 7 and 20 million dollars. *Id.* at *3. The Western District of Michigan stated

> [T]he [*Agne*] court found that § 3293 did not apply because the bank suffered "no realistic prospect of loss"; any withdrawals from the bank were fully protected by a letter of credit against an account with sufficient funds to reimburse the withdrawals shortly after they were made. In contrast, there was no similar guarantee in Defendant's case that the banks could recover what was due to them. They had to institute foreclosure actions and seek reimbursement from the title insurance companies. Those actions might have been unsuccessful for any number of reasons.

*Gahan*, 2018 WL 5603535, at *10.

The government relies on several cases in which courts found that a new or increased risk of loss to a financial institution was enough to establish that it was "affected." In *United States v. Stargell*, 738 F.3d 1018, 1022 (9th Cir. 2013), the court noted that "[t]he increased risk of loss presented by fraudulent terms is sufficient to 'affect' a financial institution," noting that the Ninth Circuit was "join[ing] our sister circuits in defining such term to include new or increased risk of loss to financial institutions." Defendant Stargell had prepared and submitted "federal income tax returns containing false statements" and then attempted to "obtain refund anticipation loans ("RAL") based on these fraudulent returns." *Id.* at 1021. In instances where the IRS detected fraud and did not issue a tax refund, it resulted in a loss to the banks that had made the RALs. *See id.* The banks lost money on only one of four fraudulent returns and the defendant argued that she should have been acquitted "because the government failed to prove that such counts 'affected a financial institution'" under 18 U.S.C. § 1343. *Id.* at 1022. "The banks were *affected* because the risk of loss on the RAL's was increased by the fraudulent nature of the related returns." *Id.* at 1023.

9

The cases provided by both parties show that most circuit courts have come to the conclusion that for a fraud to "affect" a financial institution under § 3293, it is not necessary that the offense have a "direct negative impact" on the institution, but that an "increased risk of loss is sufficient . . . ." *See generally United States v. Serpico*, 320 F.3d 691, 694 (7th Cir. 2003); *see also United States v. Martin*, 803 F.3d 581, 590 (11th Cir. 2015) ("[A] federally insured financial institution—granted mortgages on that apartment based on falsified representations of the buyer's ability to repay, plainly resulting in an increased risk of loss through default. That increased risk sufficiently affected a financial institution."); *United States v. Mullins*, 613 F.3d 1273, 1279 (10th Cir. 2010) (Fraudulent information on a loan application "causes the lender to overestimate a borrower's ability to pay off the loan, creating a greater risk of default, foreclosure, and loss to the lender." "The mortgage companies, as wholly owned subsidiaries, would then pass any loss suffered on to their parent financial institutions."); *Serpico*, 320 F.3d at 695 (Regarding a "loans-for-deposits" scheme and loans obtained through financial institutions—"the fact remained that the bank made risky loans at low interest rates that it never would have made absent the scheme"); *United States v. Allen*, 160 F. Supp. 3d 698, 706 (S.D.N.Y. 2016) ("if a juror concludes that a bank would have made different investment decisions if it had known of the fraud, then a juror could legitimately conclude that a bank was 'affected' within the meaning of [§ 3293]"); *United States v. Marr*, 760 F.3d 733, 744 (7th Cir. 2014) ("In *United States v. Serpico*, 320 F.3d 691, 694 (7th Cir. 2003), we approved a jury instruction in a wire fraud case which stated that schemes affected the banks if they 'exposed the financial institution[s] to a new or increased risk of loss.').

10

The government argues that allegations in paragraph 58 of the indictment are sufficient to deny Defendant's motion.

> The scheme to defraud detailed above affected Wells Fargo Bank, N.S., a financial institution, which, to wit, took ownership of certain fraudulently-sold Policies and became the beneficiary of those Policies, by, among other effects, creating new and increased risks of loss, including risks of loss relating to the fees earned by Wells Fargo, time and resources expended in relation to the fraudulent transactions, and risk of litigation.

(Indictment ¶ 58, ECF No. 1.)[4]

In this case, a signed life insurance settlement application (identified in the indictment as the "Credit Suisse settlement application") was submitted to Credit Suisse on or about August 2010 by "Owner A" of the life policy #3495. (Indictment ¶ 35, ECF No. 1.) "On or about September 8, 2010, Wells Fargo Bank, N.A. made an interstate wire transfer of approximately $1.9 million to Owner A as payment for the purchase of" life policy #3495. (Indictment ¶ 39, ECF No. 1.) "On or about September 20, 2010, Wells Fargo Bank, N.A. made an interstate wire transfer of approximately $200,000 to Broker A as payment for the purchase of Lincoln Benefit Life Policy #3495." (*Id.* at ¶ 40.) A similar process occurred for Policy #3691, but the indictment does not identify a purchaser or intermediary. (*Id.* at ¶ 42)

With its response, the government provides additional documents including a Securities Account Agreement and memorandum of interview with Wells Fargo employees to explain the sales of life insurance policies using the Intermediary Accounts in general. (ECF Nos. 134-2.) As the securities-intermediary, Wells Fargo holds the

---

[4] The Court notes that the indictment charges a fraud affecting only Wells Fargo Bank, N.A., which acts as securities intermediary for Credit Suisse Life Settlements LLC in the transactions set forth in the indictment. (Indictment, ¶ 34, 35; ECF No. 134-3.)

insurance policies as owner and beneficiary in name. (ECF Nos. 134-2, 134-3.) Yet it is not Wells Fargo's funds that have been invested in the purchase of the policies. It is distinguishable from those cases where fraud in obtaining a loan, or fraud in obtaining funds on which a loan is based, such as RALs, increase the risk to the bank of a default on the loan, an increased risk of the loss of the financial institution's funds. As set forth in documents provided by the government, Wells Fargo benefits from service fees charged to hold the policies in a Securities Account and to execute those limited services offered for a fee and related to the account. (ECF No. 134-2.) Like *United States v. Grass*, the indictment notes that Wells Fargo is at risk of "loss relating to the fees earned by Wells Fargo" for maintaining and servicing the intermediary account. (Indictment ¶ 58); *see also United States v. Grass*, 274 F. Supp. 2d 648, 646, 656 (M.D. Pa. 2003) (*Grass* considered criminal forfeiture and the term "affecting a financial institution" where the defendants caused a bank to transfer over $2 million from another account to their own. The losses that these institutions suffered, according to the Government's allegations, are nothing more than routine transaction fees and lost income"); *see also United States v. Esterman*, 135 F. Supp. 2d 917, 920 (N.D. Ill. 2001) (The defendant defrauded a bank customer "but his depredations did not have any cognizable impact on Edens Bank itself.").

In other cases cited by the government in which the courts found that there was an increased risk to a financial institution, the financial institution acted as a lender in some capacity, or the fraud was closely tied to the financial institution, being perpetrated by an employee and increasing the risk of litigation. *See, e.g., United States v. Bogucki*, 316 F. Supp. 3d 1177, 1188-91 (N.D. Cal. 2018) (Considering a fraud perpetrated by

bank employee, the district court determined that "§ 3293(2) encompasses a broad range of possible effects." "A jury could find that [the defendant's] alleged fraud exposed the bank to a risk of loss through litigation, whether or not it actually suffered one." Barclays had "signed a declination letter agreeing to pay over $12 million as a result of Bogucki's conduct," "evidence that the trier of fact may consider in determining whether Bogucki's alleged conduct risked a loss to the bank." The court also found that "the reputational risk claimed here goes to the heart of the bank's business" and is a risk encompassed by the statute. The defendant's trading "exposed Barclays to a risk of loss stemming from an alleged scheme to defraud."); *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 630-31 (S.D.N.Y. 2013) ("Courts have repeatedly held that in order to allege such an effect, the Government need not allege actual harm, but only facts that would demonstrate that the bank suffered an increased risk of loss due to its conduct." The complaint alleged that the bank's fraudulent underwriting practices led to it issuing loans that had a higher risk of default, resulting in it having to indemnify HUD, and that the bank's misconduct exposed it to "considerable legal liability" including legal expenditures, settlements and the prospect of treble damages and civil penalties.); *United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438, 452 (S.D.N.Y. 2013) ("[T]he court rejected a defendant's argument that a financial institution participating in a fraudulent scheme could not be "affected" because it was not the victim of the scheme.").

The Court finds that both the allegations of the indictment, as well as the structure of Wells Fargo's involvement in the alleged fraud is more like that of *Grass* and *Agne*, where Wells Fargo was utilized in holding insurance policies in an account for another, despite taking on the role as owner and beneficiary. In the indictment, the government

13

identified the effects on Wells Fargo as "creating new and increased risks of loss, including risks of loss relating to the fees earned by Wells Fargo, time and resources expended in relation to the fraudulent transactions, and risk of litigation."[5] (Indictment ¶ 58.)

Unlike those cases in which the fraud exposed the financial institution to an increased risk of loan default, costly litigation, or actual losses through settlements and attorney's fees, here there is no loan, no alleged settlement. The risk of loss here is several steps more remote than those cases cited by the government. Wells Fargo's role, though it holds the policies in name, is akin to that of escrow agent in the initial transaction, which then services the account and provides fee-based administrative functions. (ECF No. 134-2.)

The Securities Account Agreement with Credit Suisse Life Settlements LLC provides for indemnification of Wells Fargo as Securities Intermediary against "any and all claims, losses, causes of action, demands, damages, liabilities and expenses of every kind (including reasonable attorneys' fees and expenses) . . . ." (ECF No. 134-3, PageID.2410.) The Court declines to read 18 U.S.C. § 3293 more broadly on these facts. *See United States v. Carollo,* 2011 WL 5023241, at *4 (S.D.N.Y. Oct. 20, 2011) ("[A]lthough Congress intended the language 'affects a financial institution' to be broadly construed ... this Court cannot interpret § 3293 to be so broad as to allow a ten-year

---

[5] "It has happened in the past that Wells Fargo has been brought into litigation in these types of scenarios such as the purchaser being defrauded. . . ." If testifying in litigation on behalf of Wells Fargo as the Security Intermediary, the Wells Fargo employee doesn't bill directly for this time, "[i]f there were travel or legal fees, they are fees charged back to the client by Wells Fargo." There is a group within Wells Fargo "which helps with these types of scenarios and on occasion has charged the client for their time . . . ." (ECF No. 134-2 ¶ 22-24.)

14

statute of limitations to apply where, as here, the government has not alleged that the financial institutions suffered any actual loss or at most the risk of loss is de minimis."); *see also United States v. Ghavani*, 23 F. Supp. 3d 148, 162 (S.D.N.Y. 2014) ("Thus, *Carollo* suggests merely that a financial institution is not "affect[ed]" by an increased risk of loss, where no more than a de minimis risk of loss has been shown."). For these reasons, the Court finds that the allegations in the indictment do not sufficiently charge that the fraud affected a financial institution. Thus the five year statute of limitations applies.

**2. Whether the Status Check Phone Calls Extended the Statute of Limitations**

Next, Defendant argues that the alleged crime of conspiracy to commit wire fraud as alleged in Count 1 was completed on September 10, 2010, with the last wire transfer of sale proceeds to Owner A. (Indictment ¶¶ 24, 40, 61, 65; Motion, ECF No. 124, PageID.2219.) "To determine the scope of the alleged conspiratorial agreement, the court is bound by the language of the indictment." *United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001) (citations omitted). In the indictment, the objective of the conspiracy was stated as follows: "The purpose of the scheme to defraud was for the defendants to obtain money and enrich themselves by, among other things, inducing entities to purchase, through false and fraudulent representations, life insurance policies in which the life of OWNER A's MOTHER was insured." (Indictment, ¶¶ 24, 61.)

The government argues that "where a conspiracy contemplates a continuity of purpose and continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn." *United States v.*

*Gardiner*, 463 F.3d 445, 463 (6th Cir. 2006). Yet *Gardiner* involved a RICO conspiracy and the Sixth Circuit noted that it believed "that the activities alleged by the government in the indictment against [the defendant] are also precisely the type of activity that contemplates a continuity of purpose and continued performance of acts." *Id.* at 463-64 ("a distinction should be made between acts of concealment done in furtherance of the criminal conspiracy and those taken after the criminal objectives have been obtained").

That is not the type of conspiracy which the government charged here. The language of the indictment shows that the alleged conspiracy ended when the Defendants obtained their common goal: the receipt of money in September 2010 after "inducing entities to purchase" the Policies

Defendant Benderoff participated in 3 phone calls approximately six years after Defendants obtained the money from the sale of the life insurance policies. The calls were for the purpose of providing information regarding Owner A's mother's "whereabouts, medical condition and attending physician," and "medical status and place of residence." (Indictment ¶ 46(a), (b).) The calls are described in the indictment as follows: "In providing ongoing updates regarding OWNER A's MOTHER's purported medical status, BENDEROFF, as the defendants had originally devised in 2010, aimed to lull victims into a false sense of security regarding their purchase of the Policies and make it less likely that the fraudulent scheme would be discovered." (Indictment ¶ 49.) On the three identified occasions of calls in 2016 and 2017, Defendant Benderoff "indicated, . . . . that OWNER A's MOTHER was in stable health." (Indictment ¶ 47(a), (b), and (c).)

16

The calls described in the indictment "do not point to acts in furtherance of the alleged conspirators' common goal and therefore may not be relied upon to extend the conspiracy" for the purposes of the statute of limitations. See *Hitt*, 249 F.3d at 1017. "[A]n agreement to conceal a completed crime does not extend the life of a conspiracy, . . ." *United States v. Howard*, 770 F.2d 57, 60 (6th Cir. 1985) (citing *Grunewald v. United States*, 353 U.S. 391, 405 (1957)) In *Howard*, the conspiracy to defraud an insurance company of insurance proceeds remained ongoing where the insurance company had not yet "paid the insurance claim at the time of the taped conversations and was still investigating the cause of the fire." *Id.* at 60. Unlike *Howard*, here there was neither money nor proceeds outstanding on these policies from the Defendants' perspective and as set forth in the indictment. Had the calls never taken place, had Defendant not communicated about the current "status" of Owner A's mother, it would have had no effect on the goal of the alleged fraud, which had been completed years earlier. The calls are alleged to have been for the purpose of making it less likely that the scheme would be discovered. The "Purpose of the Scheme" as set forth in paragraph 24 of the indictment and specifically cross-referenced in Count One as the "Object of the Conspiracy" contemplates a conspiracy with a clear central objective or aim, which was obtained in September 2010 with the sale of the second Policy and receipt of proceeds. The calls do not extend the date of the conspiracy beyond September 2010 for purposes of the statute of limitations. Because the five year statute of limitations applies, the charges in counts 1 through 4 were brought outside the limitations period.

### 3. Whether Counts 5 through 7 State a Crime

Counts 5 through 7 charge Defendant Benderoff with fraud under 18 U.S.C. § 1343 and 2, based on three "lulling interstate telephone conversation[s]" he had with Mills, Potoczak, and Co. regarding Owner A's mother's health status. (Indictment ¶ 68.) These calls took place on March 24 and September 22, 2016 and March 22, 2017.[6] (*Id.*) Defendant argues that his answering these calls and giving basic information does not meet the elements of wire fraud. (ECF No. 124, PageID.2222.)

The government relies on *Schmuck v. United States*, 489 U.S. 705 (1989), to argue that the "lulling" phone calls were in furtherance of the scheme. (Response, ECF No. 134, PageID.2393.) In *Schmuck*, the defendant altered odometer readings and resold cars to retail dealers for prices that were artificially inflated based on the low-mileage odometer readings. The defendant argued that title-registration mailings made by unwitting dealers on behalf of their purchasers "were not made in furtherance of his scheme." *Id.* at 707-08. The Court held that "[i]t is sufficient for the mailing to be incident to an essential part of the scheme, . . . or a step in [the] plot." *Schmuck,* 489 U.S. at 710-11 (internal quotations and citations omitted). In *Schmuck*, the Court specifically noted that "Schmuck's was not a 'one-shot' operation in which he sold a single car to an isolated dealer." *Id.* at 711. He had an employee turn back the odometers on approximately 150 cars, which he marketed to a number of dealers over an extended period of years. *Id.* "His was an ongoing fraudulent venture. A rational jury could have concluded that the success of Schmuck's venture depended upon his continued harmonious relations with,

---

[6] The Court notes that the indictment does not indicate to which of the Policies the calls are relevant.

18

and good reputation among, retail dealers, which in turn required the smooth flow of cars from the dealers to their Wisconsin customers." *Id.* at 711-12. Unlike *Schmuck*, here the fraud was fully complete in 2010, years before Defendant answered the 2016 and 2017 phone calls. Further, the indictment does not allege that materially false information was provided in those calls. (Indictment ¶ 47.) Thus the government fails to allege essential elements of the substantive wire fraud charged in counts 5 through 7. The Court will grant Defendant's motion to dismiss with respect to counts 5 through 7 for failure to state an offense.

## III. Conclusion

For the reasons stated herein, the Court grants Defendant's motion to dismiss the indictment (ECF No. 124).

SO ORDERED.

<u>s/Nancy G. Edmunds</u>
Nancy G. Edmunds
United States District Judge

Dated: September 12, 2022

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 12, 2022, by electronic and/or ordinary mail.

<u>s/Lisa Bartlett</u>
Case Manager